IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 7, 2004

**HOWARD BUCHANAN v. TONY PARKER, WARDEN**

**Direct Appeal from the Circuit Court for Lake County**
**No. 04-CR-8551   R. Lee Moore, Jr., Judge**

——————————

**No. W2004-01386-CCA-R3-HC  - Filed January 6, 2005**

——————————

The Petitioner, Howard Buchanan, was convicted in 1998 of aggravated kidnapping, and the trial court sentenced him, as a Range II offender, to eighteen years in prison.  This Court affirmed the Petitioner's conviction and sentence on direct appeal, and the Tennessee Supreme Court denied the Petitioner's request for permission to appeal.  In 2004, the Petitioner filed a pro se petition for habeas corpus relief, which the trial court summarily dismissed.  On appeal, the Petitioner contends that the trial court erred when it dismissed his petition because, among other things, the indictment that charged him with aggravated kidnapping was invalid.  Finding no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Howard Buchanan, Pro se.

Paul G. Summers, Attorney General and Reporter; and David E. Coenen, Assistant Attorney General; for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

The Petitioner was convicted of aggravated kidnapping on March 23, 1998, and the trial court sentenced the Petitioner, a Range II offender, to eighteen years in the Tennessee Department of Correction.  On direct appeal, this Court affirmed the Petitioner's sentence and conviction.  State v. Howard Buchanan, No. M2000-00878-CCA-R3-CD, 2001 WL 261544, at *1 (Tenn. Crim. App., at Nashville, Mar. 16, 2001), *perm. app. denied* (Tenn. Sept. 10, 2001).  The following facts were set forth in our opinion on the Petitioner's direct appeal:

All charges in this case stem from an incident which occurred in August 1997.  The

victim, Angie Louise Tidwell, testified at trial that she and the Defendant were involved in a romantic relationship during the summer of 1997. At the time, the victim lived in a duplex in a housing project called Evans Heights, and according to the victim, the Defendant lived in a duplex in the same area that was in walking distance of her home. She claimed that while they dated, she allowed the Defendant to enter her home at will because she was afraid of him. However, she stated that the Defendant neither lived with her nor had a key to her duplex.

The victim testified that by the end of August 1997, she had tried several times to break off their relationship, but she reported that the Defendant rejected each of her efforts to end the relationship. According to the victim, the Defendant entered her duplex on August 28, 1997 with a stolen key. She stated that despite her repeated pleas for him to leave, the Defendant insisted on staying. She maintained that the Defendant physically forced her to remain in her home with him and her young son for the following three days.

During the three days, according to the victim, the Defendant constantly threatened her, telling her that if she called the police, he would kill her. The victim recalled that while the Defendant held her captive, he consumed quite a bit of alcohol and was violent toward her. The victim described the Defendant as angry and "inhuman . . . like a wild animal." She stated, "I was scared for my life, very much so. I still am." The victim recalled that the Defendant "pushed [her], shoved [her], [and] called [her] horrible names." She testified, "[The Defendant] [t]old me that if he wanted to do anything with me, that it would be done." The victim stated that the Defendant required her to stay within ten feet of him at all times, and when she approached the door, he "would grab [her] either around [her] neck or . . . arm leaving bruises and marks." She also testified that the Defendant punched her in the face, giving her a black eye, and that he tried to choke her. In addition, she testified that he bit her back, and she stated that at the time of trial, she still had a scar on her back from the bite. The victim recalled that on one occasion, which she described as "humiliating," the Defendant sat on top of her while she sat on her toilet and told her that "if [she] could remove him, . . . he would leave."

The victim explained that she was unable to get help during the time that the Defendant held her captive because her phone was disconnected. She also testified that she could not open the back door to her duplex because its lock had been stripped. She further testified that she did not know her neighbors and was unsure whether the duplexes surrounding hers were occupied. She stated that during the three days that the Defendant remained in her apartment, she fell asleep "only . . . when [she] was totally exhausted," and she reported that when the Defendant slept, "he would . . . wake up at the very slightest noise." She recalled that she tried to leave the apartment once while the Defendant slept, but the Defendant woke up, ran towards her, grabbed her, and "slammed [her] on the couch."

According to the victim, on the third day of her ordeal with the Defendant, two children knocked on the victim's door to ask her son to go to the playground with them. The Defendant allowed her son to leave with the children, and as her son left, the victim followed him. The victim stated that the Defendant, who was approximately ten feet away from her in her home at the time, chased her outside. Outside the duplex, he caught her, picked her up, and began to carry her back inside. The victim began to scream, and the Defendant threatened to kill her if she did not stop. However, she continued screaming, and the Defendant "threw [her] on the ground." The victim jumped up and ran toward a nearby playground, where she heard the voices of other people. The Defendant followed.

At the playground, the victim found members of the Defendant's family. She stated that the Defendant continued to taunt her in front of his family by forcefully throwing sticks and pebbles at her and by calling her names. The victim testified that he also threw a bullet at her, which he had apparently brought with him, and said, "This is yours. I have one of these for you." Eventually, however, the Defendant began to converse with someone at the playground, and the victim used the opportunity to run to a nearby payphone. The victim testified that as she dialed 911, the Defendant noticed her actions and approached her. The victim therefore dropped the phone and ran back to the other people at the playground, hoping to find safety among them. When the Defendant reached the payphone, he hung it up. He then followed the victim, continuing to threaten to kill her, but turned away when his brother, one of the people at the playground, told him to leave. Shortly thereafter, police cars arrived at the scene.

Officer Woody Chandler and Corporal Jackie Mosley of the Dickson Police Department responded to the victim's hang-up call on August 30, 1997. Officer Chandler arrived first at the scene, and after assessing the situation, stopped a vehicle in which the Defendant was riding so that the officers could talk to the Defendant. Corporal Mosley arrived soon afterwards and spoke first with the victim, whom he described as "distraught and . . . upset." He noted that the victim had a black eye and "some injuries to her face." Mosley testified that the victim reported that the Defendant had broken into her apartment and that she had been assaulted. She then pointed out the Defendant, who was sitting in the car that the Officer Chandler had stopped.

Chandler stated that when he stopped the vehicle in which the Defendant was riding, the Defendant got out of the car and became belligerent, telling Chandler that "he had places to be and places he wanted to go and if [Chandler] didn't know [why he had stopped him], he was leaving." However, Chandler required the Defendant to remain at the scene until Mosley could speak with him. Mosley stated that when he approached the Defendant to question him, the Defendant appeared to be agitated and uncomfortable. According to Mosley, after he informed the Defendant of what the

victim had told the officers, the Defendant began "cussing and carrying on." When Mosley informed the Defendant that the victim wished to institute criminal proceedings against him, the Defendant got out of the vehicle, walked around to the driver's side of the car, and began to run. Two officers pursued him on foot, and he was eventually caught and transported to the police department.

Officer Chandler testified that the Defendant was "very irrational" on his ride to the police department and while at the police department. According to Chandler, on the way to the police department, the Defendant threatened to kill Chandler and "that bitch too." The Defendant also told Chandler, "I'm hopelessly hooked on crack cocaine." However, Chandler testified that at times, the Defendant "calm[ed] down . . . and [would] be happy and smiling" before lapsing back into an angry, threatening mood. Chandler further testified that while at the police department, he overheard the Defendant talking on the telephone. He stated that he heard the Defendant say to the other party on the phone, "I want you to get that bitch tonight. I can't get out of here and do it myself, so I want you to do it for me." Officer Chandler testified that at the time of his arrest, the Defendant provided a home address different from that of the victim. Chandler stated that the address provided by the Defendant was "right up the street" from the victim's duplex.

Chandler also stated that he observed the victim at the police department and noted that she had a black eye. In addition, both Chandler and Mosley testified that they viewed Polaroid photographs taken at the police department of a "bite mark" on the victim's back. However, Chandler stated that the photographs were not available at trial because, despite an exhaustive search, they had disappeared from the police department. Chandler testified that the victim's injuries appeared to be more than a day old at the time of the Defendant's arrest, but stated that he had no expertise in identifying the age of injuries.

The defense called Ruby Brody, who had known the Defendant since childhood, and her husband, Johnny Brody, to testify. Each testified that the Defendant and the victim were living together at the time of the crime.

Anthony Springer, the Defendant's cousin, also testified that the Defendant and victim were living together during the summer of 1997. He stated that he transported the Defendant to and from the victim's apartment almost every day in July and August of 1997. Springer also testified that the Defendant came to his house to help repair a car on the day before his arrest, a Friday. In addition, Springer testified that he visited the victim and the Defendant at the victim's duplex on the previous day, a Thursday. He recalled that when he visited the Defendant on Thursday, the victim seemed to be alright, and he stated that she did not have a bruise on her face at the time.

Jennifer Frazier, the Defendant's cousin, testified that on one of the two days prior to the Defendant's arrest, the victim called her and asked whether the Defendant was at Frazier's house. She stated that the victim was angry at the time because the Defendant and Anthony Springer had stayed out almost all night together the night before. She also testified that the victim and the Defendant were living together at the time of the crime.

Buchanan, 2001 WL 261544, at *1-3. In 2004, the Petitioner filed a petition for habeas corpus relief alleging: (1) "Absolute innocence issue due to judgment has created a manifest injustice;" (2) "Judgment is void due to it was established on the sole foundation of falsified [and] perjury testimony that was knowingly submitted by the prosecution;" (3) "Judgment is void due to denial of compulsory process [and] due process of evidence that would have impeached the victim['s] credibility;" (4) Judgment is void due to improper instructions on kidnapping, that resulted in double jeopardy;" and (5) "Judgment is void due to a chronic break down in the adversarial process of sentencing this defendant to 35 percent to serve and then month later changing [a]foresaid judgment to 100 percent without any form of due process." The Petitioner stated in his petition that the legality of his restraint had not already been adjudged upon by a prior proceeding and, to his petition, he attached a Judgment of Conviction form entered on what appears to have been filed on July 17, 1998.

On March 31, 2003, the trial court entered an order appointing a public defender to represent the Petitioner and set a date for an evidentiary hearing. In that order, the trial court noted, "It appears to the Court that this petition may not be proper subject for habeas corpus relief. However, the Court will conduct an evidentiary hearing to determine if habeas corpus relief is appropriate."

Thereafter, the State filed a motion to dismiss the petition for habeas corpus relief, contending that the petition failed to state a colorable claim. The State first asserted that all of the Petitioner's claims, even if proven, would render his conviction voidable and not void and were, therefore, inappropriate grounds for habeas corpus relief. Further, the State asserted that the Petitioner failed to comply with the statute governing habeas corpus petitions because he failed to attach a copy of his final judgment. The State asserted that the judgment that the Petitioner had attached to his petition had been amended, as noted by this Court on direct appeal, to reflect the proper sentence range for aggravated kidnapping.

Before holding an evidentiary hearing on the Petitioner's petition, the trial court entered an order denying the petition. In that order the trial court stated:

On March 12, 2004, [the Petitioner] filed "Petition For Writ Of Habeas Corpus." Petitioner alleges that he was convicted of aggravated kidnap[p]ing, simple assault and evading arrest. He alleges that aggravated kidnap[p]ing is a Class B felony. The other convictions are Class A misdemeanors. Petitioner states that he was found guilty by a jury. Petitioner also alleges that he was sentenced to eighteen (18) years as a Range II offender at 35% for the aggravated kidna[p]ping. He was also

-5-

sentenced to 11 months and 29 days on each of the two misdemeanor charges. All sentences were to run concurrently. He alleges that the sentencing took place on July 17, 1998. Petitioner states that the judgment is void due to denial of compulsory process and due process of evidence that would have impeached the victim['[]s credibility. He states also that the judgment is void due to improper instructions by the trial judge. He also states that judgment is void due to a chronic breakdown in the adversarial process during the sentencing hearing. He states that his sentence was eighteen (18) years as a Range II offender to be served at 35%, and that several months later the judgment was changed so as to serve the sentence at 100%. The Petition for Habeas Corpus does not state how the judgment was changed. Consequently, this Court appointed the Public Defender to represent the [P]etitioner and scheduled an evidentiary hearing for April 27, 2004. The hearing was not conducted on April 27, 2004. It was rescheduled for May 25, 2004. In the interim, however, the State Attorney General's office filed a Motion to Dismiss the Petition for Habeas Corpus Relief along with a Supporting Memorandum. The Supporting Memorandum also contained a copy of an opinion from the Court of Criminal Appeals on [the Petitioner's] actual case. It is obvious from . . . [that opinion] that all of these issues were argued on appeal. It is also obvious that the trial court improperly sentenced the [Petitioner] to eighteen (18) years at 35% when statutory requirements indicate that this sentence would have to be served at 100%. The trial court corrected its error on March 3, 1999, by amending its judgment to show [the Petitioner's] release eligibility status at 100%. This issue was also argued on appeal, and the Court of Criminal Appeals ruled on this issue and the other issues. The other issues raised by the [Petitioner] are not proper for habeas corpus relief. The issue of whether or not the sentence is illegal, does not require an evidentiary hearing as it appears from the reported case that the amended sentence was a legal sentence.

Habeas corpus relief is limited to cases in which the judgment is either void or the term of the imprisonment has expired. The judgment in this case is not void nor has the term of imprisonment expired. The Petition for Writ of Habeas Corpus of Howard Buchanan, is, therefore, dismissed.

The Petitioner filed a timely notice of appeal. The trial court entered a second order, in which it relieved the Public Defender's Officer from pursuing the appeal on the Petitioner's behalf.

## II. Analysis

On appeal, the Petitioner contends that: (1) the trial court erred by dismissing his petition for habeas corpus relief; (2) his court appointed lawyer erred by failing to supplement his petition for habeas corpus relief; (3) the trial court improperly failed to conduct an evidentiary hearing; and (4) the judgment of conviction is void because it is predicated on an invalid indictment. Article I, section 15 of the Tennessee Constitution guarantees its citizens the right to seek habeas corpus relief. In Tennessee, a "person imprisoned or restrained of [his or her] liberty, under any pretense

whatsoever . . . may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment . . . ." Tenn. Code Ann. § 29-21-101 (2000). The grounds upon which habeas corpus relief will be granted are very narrow. See State v. Ritchie, 20 S.W.3d 624, 630 (Tenn. 2000). "Unlike the post-conviction petition, the purpose of a habeas corpus petition is to contest void and not merely voidable judgments." Potts v. State, 833 S.W.2d 60, 62 (Tenn. 1992). Therefore, in order to state a cognizable claim for habeas corpus relief, the petition must contest a void judgment. Id. "A void judgment is one in which the judgment is facially invalid because the court did not have the statutory authority to render such judgment . . . . A voidable judgment is one which is facially valid and requires proof beyond the face of the record or judgment to demonstrate its voidableness." Dykes v. Compton, 978 S.W.2d 528, 529 (Tenn. 1998) (citing Archer v. State, 851 S.W.2d 157, 161 (Tenn. 1993)). Thus, a writ of habeas corpus is available only when it appears on the face of the judgment or the record that the convicting court was without jurisdiction to convict or sentence a defendant, or that the sentence of imprisonment or other restraint has expired. Archer, 851 S.W.2d at 164; Potts, 833 S.W.2d at 62.

The petitioner bears the burden of showing, by a preponderance of the evidence, that the conviction is void or that the prison term has expired. Passarella v. State, 891 S.W.2d 619, 627 (Tenn. Crim. App. 1994). Furthermore, the procedural requirements for habeas corpus relief are mandatory and must be scrupulously followed. Archer, 851 S.W.2d at 165. It is permissible for a trial court to summarily dismiss a petition of habeas corpus without the appointment of a lawyer and without an evidentiary hearing if there is nothing on the face of the judgment to indicate that the convictions addressed therein are void. See Passarella, 891 S.W.2d at 627; Rodney Buford v. State, No. M1999-00487-CCA-R3-PC, 2000 WL 1131867, at *2 (Tenn. Crim. App., at Nashville, July 28, 2000), perm. app. denied (Tenn. Jan. 16, 2001). Because the determination of whether habeas corpus relief should be granted is a question of law, our review is de novo with no presumption of correctness. Hart v. State, 21 S.W.3d 901, 903 (Tenn. 2000).

The Petitioner in this case asserts, in part, that his court appointed attorney failed to supplement his petition for habeas corpus relief and that the trial court failed to conduct an evidentiary hearing. It appears from the record that the trial court dismissed the Petitioner's petition before his court appointed attorney had the opportunity to amend the petition. Therefore, we review both of these two assertions by the Petitioner as one, namely whether the trial court erred when it summarily dismissed the petition, prior to holding an evidentiary hearing or affording the Petitioner an opportunity to amend his petition. We first note that the Petitioner failed to include a copy of the final judgment in his petition for habeas corpus relief, which is a failure to comply with the procedural requirements. Therefore, because of this failure, the Petitioner is not entitled to relief. However, even were we to address the issues on the merits, the Petitioner is still not entitled to the relief that he seeks. As stated above, the trial court can summarily dismiss a petition for habeas corpus relief without an evidentiary hearing if there is nothing on the face of the judgment to indicate that the convictions addressed therein are void. Here, the trial court reviewed the Petitioner's original petition, and determined that an evidentiary hearing was warranted. The trial court later determined that the judgment attached to the Petitioner's petition was not the one by which he was incarcerated and that the amended judgment by which the Petitioner was incarcerated was facially

valid. The trial court noted that this issue had been adjudicated by this Court in the opinion from the Petitioner's direct appeal. We conclude that the trial court was correct in all these determinations, and it did not err by summarily dismissing the Petitioner's petition.

Furthermore, whether a petitioner in a habeas corpus proceeding should be permitted to amend his petition is a matter which addresses itself to the sound discretion of the trial court. Paul G. Hull v. State, No. 02C01-9605-CC-00183, 1997 WL 346215, at *2 (Tenn. Crim. App., at Jackson, June, 24 1997), *no perm. app. filed* (holding that a trial court did not abuse its discretion by denying a petitioner's motion to amend his habeas corpus petition) (citing Milton Holt v. State, No. 01C01-9110-CC-00321, 1992 WL 127406 (Tenn. Crim. App., at Nashville, June 12, 1992), *perm. app. denied* (Tenn. Sept. 14, 1992)). This Court will not interfere with the exercise of this discretion unless it appears on the face of the record that it has been abused. Id. (citing Weatherly v. State, 704 S.W.2d 730, 732-33 (Tenn. Crim. App. 1985)). In the case under submission, we conclude that the trial court did not abuse its discretion when it denied the Petitioner an opportunity to amend his petition before the court summarily dismissed the petition.

The Petitioner's final argument is that he is entitled to habeas corpus relief because the judgment of conviction, by which he is incarcerated, is void because it is predicated on an invalid indictment. This is an assertion that the Petitioner presents for the first time on appeal. If the Petitioner is correct and his indictment is defective, a defective indictment is an appropriate issue to be brought in a habeas corpus petition. See Wyatt v. State, 24 S.W.3d 319 (Tenn. 2000). The Tennessee Supreme Court has held that, for constitutional purposes, "an indictment is valid if it provides sufficient information: (1) to enable the accused to know the accusation to which answer is required; (2) to furnish the court adequate basis for the entry of a proper judgment; and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Further, the indictment must meet the statutory requirements of Tennessee Code Annotated section 40-13-102, which provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty, which will enable the court, on conviction, to pronounce the proper judgment; and in no case are such words as "force and arms" or "contrary to the form of the statute" necessary.

In Hill, our supreme court concluded that, although the scienter requirement was not stated in the indictment, the indictment was valid, based upon it: (1) satisfying the three aforementioned constitutional requirements; (2) complying with the notice requirements of Tennessee Code Annotated section 40-13-202; and (3) providing a basis for logically inferring the mental element of the crime charged. Id. at 726-27. The Hill court stressed that indictments should be scrutinized from the vantage point of "common sense and right reason rather than from the narrow standpoint of . . . technicality or hair splitting fault finding." Id. at 728 (quoting United States v. Purvis, 580 F.2d 853, 857 (5th Cir. 1978)). Since Hill, the Court has often repeated its intention to relax

"common law pleading requirements and its reluctance to elevate form over substance when evaluating the sufficiency of indictments." See e.g., State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). In Hammonds, the Court said, "Indeed, Hill and its progeny leave little doubt that indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." Id.; see State v. Sledge, 15 S.W.3d 93, 94 (Tenn. 2000); Crittenden v. State, 978 S.W.2d 929, 931 (Tenn. 1998); Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998). The Tennessee Supreme Court has held that an indictment may refer to the statute that defines the offense and that indictment is sufficient and satisfies all constitutional and statutory requirements. See State v. Sledge, 15 S.W.3d at 95; see also Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998).

In the case under submission, the Petitioner did not attach the indictment to his petition for habeas corpus relief and he did not raise this issue in the habeas corpus court. See Tenn. Code Ann. § 29-21-107(b)(2). Further, he did not supplement the record on appeal with the indictment. Because the indictment is not properly included in the record, the Petitioner has waived our review of this issue. Archer, 851 S.W.2d at 165. Further, he has not met his burden of showing, by a preponderance of the evidence, that the conviction is void or that the prison term has expired. See Passarella, 891 S.W.2d at 627.

The Petitioner did attach a copy of the indictment as an exhibit to his brief. After a thorough review of the indictment in this case, we find that it meets both the constitutional and the statutory requirements. The Petitioner is named as the accused, the date of the offense is give, the actus reus and mens rea of each offense is stated. Further, the indictment afforded the Petitioner clear, understandable notice that he was being charged with a violation of Tennessee Code Annotated sections 39- 13-304, -502, -102, and 39-16-603. The indictment tracks the language of these statutes and alleges all elements of each of the respective offenses. Accordingly, the Petitioner was provided adequate notice of the charges against him, and the trial court had an adequate basis for the entry of a proper judgment. Therefore, this issue is without merit.

## III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's dismissal of the Petitioner's petition for habeas corpus relief.

_____
ROBERT W. WEDEMEYER, JUDGE